and call the next case, which is Pell v. E.I. DuPont and the Wars and Company, numbers 06-5006 and 5088. Mr. Ripple and Mr. Jacobs. Take your time. Good afternoon, Your Honor. May it please the court, Raymond Ripple for the DuPont Company. And do you wish to reserve time for it? I was just going to say, if the court's pleasure, I'd like to reserve three minutes. That's fine. Thank you, Your Honor. Let me see if you can lay out for me what the documents are. I have, the first document would be the plan that I would look at. And that's the particular pages that I'm looking at are JA 1092 and 1093. And then I'll lay them out and you tell me if I have them right. Or the second I would look to, I guess, would be the continuity of service document. Right. And I'm looking in particular there at JA 1192. I believe that's right. Okay. And the third that I would look to would be the guidelines. Transfer guidelines. Transfer guidelines. And there I'm in particular looking at what looks to be JA 1046. Is that right? That doesn't sound right to me. I'm looking at. One thinks, one memorizes these, but I guess not. That is part of it, I guess. Okay. What other pages would it be as part of that? Well, it begins back further. Yeah. The JA 1046, I was looking at that because it said 11175. Right. It begins on 1037. Okay. And then the last document, I suppose, would be Mr. Waddell's letter, which would be JA 1151. Also appearing in duplicate on 899 and 890.  This case, of course, is here on appeal from the District of Delaware. It's a case in which the PELS sought and actually did receive a judgment for part of their claim for representations made outside of the plan itself. But to lay that groundwork, could you take us, if we've got the right order, one, two, and three, take us through what the plan says. Then how does that dovetail with the continuity of service provisions? And then take us through as to how the transfer guidelines. In what respect, Your Honor? I mean, this is pretty broad. I'm trying to put my – you've got a person who's with Consul. Correct. The subsidiary of Conoco. Correct. And he's obviously very concerned about making sure that his rights are preserved back to at some point prior to 1975. He says 71, but it looks like from the Waddell letter it would be 72. He's trying to make sure and ask a lot of questions. In fact, he might even say being a nudge because he's so concerned about his position if he accepts this transfer over to DuPont. And I'm trying to figure out what was told to him and what he would normally have known as an employee. The first thing he would have known of is the plan. The plan, the SPD, of course, comes with a plan. And so what is that telling? As to his date, nothing. Well, it says that on J8-1092 that services is also important. In other words, when you – your amount of service or the time of service with the particular entity. It's important for the purpose of benefit accrual in the calculation of your benefit. Right. For a full service employee's length of service, et cetera, is continuous service as determined under the company's continuity of service rules. That is the time elapsed since your date of hire or rehire, including any prior service which has been restored. So then I go to the continuity of service guidelines, and that's J8-1192. And it says there in Roman 2-1B, service includes service to the extent specified by the company's board of benefits or pensions or its delegate. Right. And so I'm looking at that, and there's – so then the board of benefits and pensions has to have done something, probably adopt a resolution at some meeting, which I don't see in the record. And then the next thing I see, all of a sudden, you're telling me that they did do something, and this person should have known that he should have gone and looked to the transfer guidelines, which are on J8-1046, which says console service for DuPont pension calculations will be recognized only from 11-175. Correct. But how is he supposed to know that, especially when after that he asks Mr. Waddell, what am I supposed to do? And Waddell gives him a letter, and as it turns out, that letter is based on a form in the transfer guidelines as to how you're to respond to people. And it's – when you look at the Waddell letter, which is, I think, January 13 of 84. Correct. And it says that his credited service date, right at the top, is 8-172. And he goes down and he says later on, both credible service and the earnings calculated in your benefit will be frozen effective with your date of transfer to DuPont. So it looks to him, at least it would look to me if I were in his shoes, that 11-172 is the date. And he might have thought – he might have thought it was his employment date of 2-10-71. But then it says down below, the pension you receive will be calculated under the DuPont plan based on your total combined service. And if he's told his credible service is 8-172, why in the world would he possibly go look to the transfer guidelines, which say 75? First of all, that letter was in great dispute with Trump, obviously. Whether or not that evidenced apparent authority from us to have Mr. Waddell, an employee of Consul, say anything about it. But who was CC'd on that letter? Oh, one of the DuPont people. But if you read the last paragraph of that letter, that's very telling. I hate to read, but I think this is very important. It is my understanding, Mr. Waddell, that DuPont will be providing you with similar letter which will describe your benefits under the DuPont plans. If you have any questions regarding your Consul benefits, please do not hesitate to write me. Remember, he had already an accruing pension from Consul. And a good part of his letter goes to that. But did DuPont then clarify the afterwards to him? As far as I know, there was no further letter. But the question was, should he have reasonably relied on this letter that will sit at the bottom as to your DuPont benefits? There's a letter coming. But the letter never came. But his testimony is a suit. If DuPont's copied and the letter says that we look at 8172, and DuPont never corrects that. DuPont didn't say that. And that's been our point all along. Consul said that. But DuPont did know it. Clearly, they were copied. They knew it someplace in the corporation. They knew what they were saying about Consul services. But if these transfer guidelines had been in effect for three months prior to that time, wouldn't somebody have said, I'm looking at this letter, and it says that your credible service date is 8172. But in fact, under our transfer guidelines, we want you to know that it's 1975. At least he would have known then, well, I might not want this job. I don't think anybody until 1991, again, addressed it, including Mr. Pell. When he made an inquiry. But it doesn't have to be Mr. Pell because, again, Mr. Pell did far more than the usual employee here. Right. Well, I don't know that.  But he was trying to be as precise as he could. And, you know, all I can say is, as to myself, I can't imagine being in his position and thinking anything other than it was at the very least 72 and not 75 because nobody as of January 13 appears to have told him that there were these transfer guidelines in place, at least for the previous three months. And that brings us right to, I think, is the keystone of this opinion that we're reviewing, and that is the extraordinary circumstances test under equitable stock. But extraordinary circumstances, you know, nobody's, look, at the outset, nobody's claiming that it was bad faith on the part of the department. Indeed, the district courts are fair. But there is case law that says that repeated, albeit inadvertent, misrepresentations can constitute, on behalf of the employee in this case, exceptional circumstances. The only real case I know of in this circuit would be the Ryan case. And I don't believe it has a caveat of albeit innocent. Those are very shocking facts, very unusual, egregious facts, which is within the medium of extraordinary circumstances. In fact, the holding of this court in this case is I'm looking at the Smith case at 6 Feb 3rd. I'm sorry, Smith. I didn't mean Ryan Smith here. That repeated oral and written misrepresentations, where the plaintiff had been diligent in attempting to obtain accurate answers regarding his coverage. But that's not all the case. All the case is what's going on in that case. The deprivation of health benefits and all the rest. But what else could Mr. Appell have done here? That's not the test. The test in this circuit under Jordan, the case Jordan, is that there must be a showing of some sort of bad faith, some sort of unconscionable conduct by the person to be estopped in order for extraordinary circumstances to be put in place. With the district court, the error it really made was, yes, we can apply it to a series of missteps here. The court then went on to specifically hold there's no bad faith here. There's only a series. Again, I'm going to correct the record. I don't think anybody questions the good faith or bad faith. I think it was all done in good faith. But the point is that time after time, including what the man asks, it just, in effect, the way I read what Judge Jordan did here was that it just wasn't fair to say that you shouldn't go back and have a recalculation date of 1972 for Mr. Appell's benefits. You had the opportunity to clarify. You knew what was happening, you knew the transfer guidelines were in place, and yet you did nothing. Your silence can't be deemed to somehow say he has to make the extraordinary circumstance when so far everything that you've done has shown him that he's okay with the earlier date. I think he does have the burden of proving the extraordinary circumstance. Well, the Waddell letter certainly is a smoking gun, isn't it? Well, then that brings up, of course, the other question we've raised here. I think we have to look at this claim as a two-part claim. One is whether he had improper inducement to make the decision to go to the Bronx. Then there's a claim, did he get misrepresentations as to his actual retirement date? We're on the second. I'm not going to say anybody improperly induced him. No, I wasn't going there. The Waddell letter and any sort of verbal communications he had with Mr. Millers and McCartney, that episode ended when he took the job. That was the inducement part. We say in our other argument on standing, that's out. Because at that point in time, he was not an employee, therefore not a participant. On January 13th, he technically wasn't, but they backdated it to January 1st, wasn't it? No, I agree. We agree that at the time he got the letter, which was probably, what, the 13th, 14th, 15th, something like that, he was not an employee. But they backdated his employment to January 1st, did they not? Yeah, but when he admits that he took the inducement to go, he was not an employee. That's in real terms. If he wasn't an employee, he wasn't a participant. I wouldn't say standing is your best argument. Well, I think it's a significant argument, especially in light of the Thurman case and Sixth Circuit. It's very, very close to us. Let me ask you another point of inquiry. Once the district court determined that DuPont was a stop from claiming that the date should be 75 and arrived at the 72 date, why shouldn't Appel have been entitled to equitable relief to obtain the payments that had not been paid prior to the district court's determination? Prior to the determination? Why was Appel not entitled to the equitable relief requested, which is part of Appel's appeal? Oh, between the bringing of the suit and the... Yeah. Well, I think under the district court there was absolutely correct that under Greg West and the other cases, restitution doesn't lie. There was no specific fund that they had brought on. Doesn't ERISA require that all funds are held in trust? And the record indicates that out of an abundance of caution, apparently, DuPont was actually paying in their contribution based on a 1972 calculation, not a 1975 calculation. If that was being done, it was being done by the computers, not an intentional... Well, but it was being done and... But the point is, under Greg West, unless you can identify the fund, and in this case you can't, a specific fund for this, restitution cannot attach. You can't have equitable remedy. That would be your argument. Well, we absolutely agree with what the district court said. The analysis is correct. That is correct. It is absolutely correct. How many years were you paying in at the 72 calculation? I don't think there's anything on record on that specifically. When did you first find out your inadvertent mistake? 2000. 2000. So he came in, this is 16 years later, over 16 years later. Well, you can't think of this as part of the fund being Mr. Pell. But my point is, if you keep making the mistake, how in the world can you say that Mr. Pell should somehow be liable? It's almost like hedgy windtails he loses. I mean, the letter was sent on January 13, 1984. Following up on that letter, DuPont administrative personnel put him in at the 72 rate calculation for over a decade and a half. Now you're saying that, geez, that shouldn't have happened, and he's the one who has to pay for it. Is that fair? No, the point was he was never entitled to war under the planned documents. Under the planned documents, he was not entitled to anything. But you were telling him for how long, including when he was making the critical decision to come to you, that, in fact, his credible service date would be at the very least 1972. His first inquiries were in 91, 98, and 2000. Those were the dates he made his inquiries. It's like you're marching up San Juan Hill, aren't you? No, I don't think that way at all. I think if you look at the requirements of this particular So we were wrong all these years. We told him when he asked the wrong information, but because the plan refers to continuity of service provisions, which in turn refers to a resolution of the board, which in turn turns out by resolution to have adopted transfer guidelines, which he did not know about, he loses. That's your argument. I'm not sure what he lost. He still has, what, $100,000, isn't it? No, I don't think it's been calculated since the judgment of the district. But he lost certainly three years of credited service. Yes, but then he went ahead and got his full pension in 2001. He went ahead and continued as a limited service employee with us for four years after that. I don't know how much it nets out. But he certainly hasn't given up his claim to the additional credited service. Well, he also, during that period of time, got his conical pension right up to 1984, too. Well, we hear from Mr. Jacobs, and I think we have three minutes with you, Mr. Reuben. Thank you, Your Honor. Appreciate it. Of course, please, since I'm a cross appellate, I don't know if I can reserve time or if the court doesn't allow that. Actually, what we'll do is we'll probably just take it all together. All together, okay. Because I don't, I mean, in terms of your rebuttal, what do you want to rebut? Okay. Thank you, Your Honor. The pals were here, I believe, as the court indicated. They relied upon the statements of DuPont. I think there is clearly that Mr. Waddell, at the time of the letter of 1984, was the agent of the DuPont company. Under the transfer document, Mr. Reuben. Retroactively, he became, or Waddell was. Waddell was. Well, Waddell was sending this, and he CC'd the DuPont company, so he made sure that they knew. Well, not only that, Your Honor, but he had the authority under the transfer document to the person to tell DuPont what the benefits were going to be, because he is the person in charge at the console, the holding of the subsidiary at that point. What makes you believe, based on this letter, that we go back to anything other than 8172? Two things. One, in the letter itself, it indicates total service, which is the 1976 or 1971. But it says credited service date, and it says underneath both, and that's at the top, and that's 8172. It says under retirement plan, both credited service in the earnings used in calculating your benefit under the console's retirement plan will be frozen, effective with your date of transfer to DuPont. So I'm not understanding how he could believe that he was entitled to the extra year and a half. Let me find the letter, Your Honor. Okay, it's JA 1151. 1151? That's what I have in mind. It's also 000202 with a bait stamp. I got it, Your Honor. First of all, we're talking about the credited service date here. We're talking about the credited service date for the console pension, which is distinctly different. In the retirement paragraph, he talks about that he will get his console pension based upon his accredited service date. When they go forward, they don't talk about his credited service date. They say that the combined service, just using service, no service date, is what the DuPont pension would be calculated on. That is 1971. And to change one thing, everything he ever got used 1971 to calculate his pension. Nothing used 1972 until the year 2000 and the court below. Every document that you have in here that shows his calculation of pension reads 1971. Yeah, why don't we do that? Okay, Your Honor. Let's go to 1991. What page is that on? Okay, thank you.  What page? 1169. 1169? Yes. Now, what I have on J1169 looks like something that's an estimate of 6391. Is that what you're looking to? Where it says your adjusted service date is 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. Correct. Right, it's an email. This is demonstrated by email. Okay. And it's 71. Okay. And we go to 70. I'm sorry, we go to? 1170. Okay, next page. And that's dated 8-10-92? Correct, that's one of the two. And if you look on top, his adjusted service date is 210-1971. And his years of service, if you calculate them, shows that 1971 is the date used for the calculations. Same thing with page 1171, which is another one at the same time. And if you turn to page 1172, you'll find that it's also 210-71. Never was 1972 ever mentioned until an email from Mr. Lesser said that he was going to adopt that date because that's the way he read the letter. Okay. And because of the continuance and because it says the total service, and service is not defined, I believe that the document that is really at question here is the SPD, which talks about the total service with DuPont, and the continuous service, which discusses the fact that it is the total service with DuPont that is subsidiary. And what page on the SPD are you looking? Let's see. The SPD is 1085, Ron. Okay. Now, what page? That's the start of it. What page are you looking at? I can't get to the exact page. Is it 1090? No. It would be 1092. What would it be? I'll look at 1090. Let's see. 1092, your definition of service. Well, that's the one I've looked. That's where I started. Okay. Yeah, you said that was the plan, but that's the SPD. Oh, that's the SPD. Okay. Yeah. The SPD, you know, if you look at that, the only thing you're supposed to go to is the calculation of service and calculation of service. If you look at the calculation of service, which I think it is. Yeah. I guess what I'm looking at was the top of the page that says pension and retirement plan. Right. So the difference between that and that, just clarify for me why I shouldn't call it the plan. SPD means what? SPD means that this is what he would provide with respect to explanation. The acronym stands for what? It's the booklet given to you. Summary of the pension. Summary of the plan. And this is just the plan summary, Ron. Okay. You can see that there's multiple pages from what it looks like. Okay. And notwithstanding all that, and notwithstanding the consistency of the 271 date, there are two things that are contrary. The Waddell letter, although it used the terms combined service, total combined service, but more importantly, did Mr. Pell know from the time he joined Consul that his pension under Consul, which essentially DuPont, the argument is DuPont assumed Consul's pension, that that pension would not start until August of 72. Okay. Let me answer it this way. Two things. One, no, the letter doesn't say that DuPont consumes. Well. And Consul pension is going to remain an entity, but DuPont will give him, the DuPont pension is going to be calculated in total service. Did he know that his Consul pension was dated on his 30th birthday? Absolutely. Correct. Did he read the letter to say that when it says combined service, and the word service includes all the time with a subsidiary, not the specific date for that particular pension plan, which is not in effect with DuPont, no. But the Waddell letter, didn't the Waddell letter also give his date of birth? I believe it does, Your Honor. 7-11-42? Absolutely. So he would have known that it wouldn't be until sometime, the first day of the first month following his 30th birthday, that he would be credited, correct? He would know for the Consul plan. He knew that before. He admitted that at the trial, that he knew that he was not eligible to enter the Consul plan until the first day of the first month after his 30th birthday. But you're saying that he relied on the sentence, JA-1151, that said, the pension you receive will be calculated under the DuPont plan, based on your total combined service. Correct, Your Honor. When he wrote his e-mails, which are in the record, to Ms. Waddell, he said, this is the first time I've ever seen any date other than 1971, which says my pension is going to start later than 19, the year for pension will start later than 1971. So although we have none of those records, it's implied that he hadn't getting records before the Uday letter, no, and confirmation that it was 71. And did he get, was he getting two checks? He got a check from Consul, which was a lump sum payment, which was subtracted from the plan and I can't tell you how, but everybody agrees it was done properly. So his DuPont pension is reduced. It was reduced by that? Oh yeah. There's no double dipping. It's reduced. Okay. All right. We address the point that I asked Mr. Ripple about on the restitution for the back payments. The record is from Dr. Porter, the head actuary, that based upon the screens that we all have here showing 1971 as being his higher date, that the pension funding for Mr. Powell would have been made from 1971 and from 1984 forward, that would have been used as a date to calculate how much money had to be available to be a fully funded plan under ERISA and not for foul of the ERISA law to show that Mr. Powell could receive his pension based on 1971 as his date for calculation of pension. So the fund was there. It was in their pension fund. The distinction that the judge below me that I think is wrong is that what is an identifiable fund? I mean, in one of the cases, you know, the attorney's escrow account, which contained money from everybody, commingled, even though there's an identifiable debt, 50,000 might have been the plaintiffs, was considered to be sufficiently identifiable. Here it's a little more than that. You have 10,000 employees, but still it's an identifiable fund that can only be used to pay pensions. So I don't know how that is not an identifiable fund. As this court, I think, found, and I always pronounce this name wrong in this case, which basically was for interest earned on money in the pension fund. So I just see that that is clearly an identifiable fund. I also think that the concept here of restitution would be you would have to show that it was equitable and not legal, and to show that, you would have to show that there was money set aside specifically for him. Do they have sub-accounts for each individual employee? No, they don't have sub-accounts. They just have a total calculation that is set aside to fund all the... Well, then the question, how can you say it's equitable? Because... Under Great West. Great West doesn't indicate... Or spread that out. All Great West says is that there has to be an equitable interest in the fund that...  There has to be money set aside for you in an identified account that was beset there. These are money set aside for Robert Jacobs, and we don't have that here. So if it's out of a mass of funds, the court would say that what you're really asking us is to pay us money from something else. Well, Your Honor, the basis of ERISA is to have a guaranteed amount of money there. To pay my pension, Mr. Pell's pension. The money is put in there to be sure that Mr. Pell's pension is funded. Now, just because it's co-mingled doesn't mean that it isn't identifiable. Time out. How do you say make restitution here an equitable remedy in this context? Because it is sufficiently identifiable under Great West to say that he has a colorable right to impress it with a trust. What we're doing is impressing the money put aside for him in his name on the calculation. His name is in the calculation based upon his year. And it isn't then Mr. Pell's account, so we have 10,000 little accounts. We have one new account, which is the money put aside for Mr. Pell. And that money is in there and is identifiable sufficiently that you can impress it with a trust. Did Justice Scalia in Great West talk about there's legal restitution and equitable restitution? Absolutely, he did. And he said legal restitution is when you're going against the general funds of the entity. I'm not going against the general funds. I'm going against the fund, which is only can be used to pay his pension. And it is not a fund that to pay the pay pensions of many people doesn't matter. It's still identifiable for a specific purpose of purpose, which was to pay his pension as to pay others. So it's sufficiently identifiable that- Did we deal with that question in Scriabin? Pardon? Did we deal with that question in Scriabin? In Scriabin, what he said was that his money was in the pension fund for the period of time before he was granted his right to the money. And because his money was in there, you don't say that it was in a separate account. In fact, it's not. It was in the T&P pension account. And because DuPont had the money in there for those five months, it earned money on it. And if it earned money and could be shown it earned money, then it owed him interest. There's no difference here. It may be a little bit bigger fund, but his money was in that account for all this time and should be allowed to have an equitable trust imposed on it because it is an identifiable account. Even though it's coming, it's no different than the attorney's escrow fund. In my escrow fund, I don't have a separate account. I've got one big account with everybody's money in it and I draw it out when I need it. Logically, your argument makes sense, but is that what we call legal restitution if the money were in your client trust fund? No, that's equitable because if it's in my client trust fund, it's an identifiable fund just to pay my client directly. If it's like a real estate closing and you put it in, well... Real estate is different because they're really individual, whereas if it's in my DuPont practice... There we agree it would be equitable restitution, correct? It certainly would be specific to the... The answer to that question is yes. Yes. Absolutely yes. But it's just the same in my escrow account for all three settlements, where it's commingled. In fact, that's what the courts have done. They've taken it out of that account, even when it wasn't identified. There's one case where it was, there's two cases where it wasn't. But isn't the most important thing to you the date of calculation? Absolutely, Your Honor. That's why when I filed my motion with respect to the appeal, I said I would withdraw the cross appeal of the court throughout DuPont's appeal. Thank you very much. Could you just begin by addressing, Mr. Pell did receive a 91 and 92, something from DuPont that said under the DuPont plan, he was going to be... His service time would go back to 2-1-71, rather than 8-1-0. Their computer printout said that Castle just referenced, and the page numbers are correct, it's reading along. And then when you look at the Waddell letter, it's a bit ambiguous when it says that DuPont will... I'm sorry, the pension you receive will be calculated under the DuPont plan, based on your total combined service. So I mean, one could read that as if it was 2-10-71. The problem with that is, at the top, and I just believe I heard my brother concede that that 72 number went to the console pension. That's what the console plan said. That's right. He's saying, don't base this on console, and actually with the offsets, this may be a sum saying that, maybe not, he's saying that under the DuPont plan, he was told that you look at the total combined service, not the console plan. He was told that not... By Waddell, the pension you receive will be calculated under the DuPont plan, based on your total combined service. And then, at the bottom, he says, wait for the letter. So the question is... Which never... We're still waiting for Godot, aren't we? Well, the problem is, at the time, when you take that snapshot of reliance, could he have relied then and made his decision? Did this make any sense? Where you've been told, wait, there's another letter coming. And his testimony is, as soon as I got that, I said, I'm on board. Well, then, okay, let's say he waited a long time for the letter, and then he made an inquiry in 91, and he was told it's 2-10-71. Makes another inquiry in 92, he's told it's 2-10-71. It gets the computer put down, starting in 92. Okay, so DuPont does what almost everybody does. I mean, obviously, when they put it in the computer, they put in the wrong date, and nobody really caught it until 2000. I think there's no dispute about that. Now, is that the type of mistake that the Jordan case talks about, is evidence... It must show some sort of evidence of bad faith or egregious conduct. No, it was a clerical error using a computer. It was a mix-up. And if this court reads, and I get them mixed up, Ryan or Smith? Smith. Smith. To write out the requirement of Jordan, I think you have a real conflict here within the circuit between those two cases, because Jordan is very careful and very thorough and backed up by several other cases. That seems to be the leading case. What's your point about the fact that the communication you most recently discussed was in the form of a computer printout? That somehow nobody can reasonably rely on figures or dates if they're in computer printouts? No, it was wrong. The point was that these things were printed out automatically by some program that was put in. Mr. Pell never interfaced with a human being here about these. Uday, Lesser, they never... Is that his fault? No. No. But what I'm trying to get at is why is it not a basis of reasonable reliance that he keeps getting one communication after another, let's say, in 1971? I'm not sure that the issue is reasonableness of reliance. Well, it's an issue for me. Not under equitable stop, that is the theory that he's going under. I don't think that is the ultimate issue. The ultimate issue, especially in this case, is whether or not it was that type of circumstance which put the actions of DuPont at risk, and we agree with the district court. One, there's no showing of bad faith. We started out with that. The presiding judge emphasized at every step that the analysis doesn't presume bad faith, it presumes good faith. But even so, why shouldn't DuPont be responsible for this long series of errors made by DuPont employees and also Consul employees? Under the particular equitable relief chosen by the plaintiff, we are not liable because There would be an injunction to use the correct calculator to calculate the date correctly. That's clearly equitable. The injunction, as a result of the adjudication on the basis of equitable stop, if the judge is finding that we are indeed stopped, then impose the injunction telling us to go back and recalculate. There's no doubt that's equitable. I'm not saying it's not equitable, but what I'm saying is that he was wrong, the district court was wrong in deciding that equitable stop existed in the first place here. Understood. I'm way over my time, I appreciate it. If the court doesn't have any further questions, we'll submit the case.